# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

INTELLECTUAL VENTURES I LLC, and
INTELLECTUAL VENTURES II LLC,          :

            Plaintiffs,          :

    v.                                          :          1:14-cv-04638-AKH

CITIGROUP, INC., CITICORP,             :          ECF Case
CITIBANK, N.A.,
                                             :
            Defendants.
                                             :
---------------------------------------------------------------x

**INTELLECTUAL VENTURES' SUBMISSION REGARDING REVISIONS TO CONSTRUCTIONS AND SUMMARIES THE COURT REQUESTED IN DKT. NO. 77**

Plaintiffs' Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") respectfully submit this response to the Court's order concerning the revision of the constructions and summaries in Docket No. 77. IV continues to assert that its previous constructions were correct. To the extent the Court did not adopt those constructions, IV believes the Court's construction is in error for all the reasons previously given. Without waiving any of its prior arguments, IV also requests that the Court revise certain of its constructions and patent summaries for the additional reasons set forth below.

## I.      U.S. PATENT NO. 7,984,081

### A.   The Court's Summary Of The Patent

The Court's summary should be revised to read:

> The '081 Patent, entitled "System and Method for Non-Programmer to Dynamically Manage Multiple Sets of XML Document Data," claims a system for organizing and modifying data in XML documents to make the document compatible and readable by a recipient user. XML documents are sometimes difficult to exchange between companies because XML document formats differ. **The '081 Patent solves the problems created by different XML document formats with a system that (1) organizes XML components into data objects, (2) maps the data objects to a "primary record type," and (3) organizes those "primary record types" into a "management record type" hierarchy. The '081 Patent also presents the data to users unfamiliar with the specifics of XML document formatting using a "dynamic document" that manages modifications back to the XML documents.**

The first two sentences are the same as the Court's summary; the remainder of the summary (bolded) constitutes IV's proposed revisions. *See* Dkt. No. 77 at 3-4. IV proposes these revisions to the summary because, as demonstrated below, the third sentence of the Court's summary ("The '081 Patent purports to solve this problem by . . .") is incorrect. *Id.* at 4. And the fourth sentence of the Court's summary ("The '081 Patent also claims to allow . . .") is unclear and no part of the Court's summary addresses the point of novelty of the '081 patent. *Id.*

Without exception, the '081 patent confirms that distinctions between the "primary

1

record type," "management record type," and "dynamic document" are important to the understanding of the inventive system.  Most importantly, these distinctions are carefully maintained throughout all of the recited claims of the '081 patent.  The specification is similarly diligent, stating up-front that "[t]he system has three major data types: primary record types (PRTs), management record types (MRTs), and dynamic documents (DD)."  '081 patent, 2:4-7.  The necessity of distinguishing these elements is maintained, without exception throughout the '081 patent.  The Court's summary should respectfully reflect these distinctions in the summary of the patent.

      The revision requested by IV incorporates these important distinctions, and avoids the generic term "record type" and additionally expressly ties the "primary record type," "management record type," and "dynamic document" to the roles articulated by the Court in the provisional summary.  For example, the claims and specification of the '081 patent each make clear that the "dynamic document" is key to the display of data that originated from XML documents to the user.  '081 patent, 3:52-60, 18:23-29, 19:20-26, 20:55-61.  Thus, in the final sentence of the summary, the requested revision confirms that the "dynamic document" element is the element that manages modifications that are made in the XML documents.  Moreover, the summary as revised includes quotation marks around each of the terms "primary record type," "management record type," and "dynamic document" to indicate to the jury that these are important, specific patent terms on which the jury should focus while deliberating the '081 patent.

      Accordingly, IV respectfully requests that the Court revise its summary of the '081 patent in accord with IV's proposed summary above.

B. "primary record type" (PRT)

| IV's Construction | Citi's Construction | Court's Construction |
|---|---|---|
| A data type that defines a data structure to contain data extracted from XML documents | A data type that defines a data structure | A unit of information, as a subset of a more general category of information, extracted from business documents and arranged for a user |

The Court's construction should be revised because a "primary record type" (PRT):

(1) is not just "any unit of information" (which could be anything);

(2) is not just "a subset of a more general category of information" (which again could almost be any known information);

(3) is not necessarily "arranged for a user" (the user actually does not typically see the PRTs directly, (s)he only sees the Dynamic Documents); and

(4) is not necessarily "extracted from [any] business documents" (PRTs are extracted from XML documents, which may or may not be business documents).

The '081 patent is clear that the inventive system "has three major data types: primary record types (PRTs), management record types (MRT), and dynamic documents (DD)." '081 patent, 2:4-6. But by construing the PRT to be *any* unit of information, that is a subset of *any* more general category of information and that is "arranged for a user," the lines between these three "*major data types*" are unnecessarily and improperly blurred such that it is difficult to distinguish between them.

All three of these terms – PRT, MRT and DD – have no accepted meaning in the art; a fact that Citi did not refute or contest. Dkt. No. 55 at 13-14; Dkt. No. 64 at 16-18. Therefore, this term may only be construed as broadly as the specification allows. *See, e.g., Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (holding that where "a

3

disputed term lacks an accepted meaning in the art . . . [the court] construe[s] a claim term only as broadly as provided for by the patent itself"); *Honeywell Intern. Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007).

As previously demonstrated, the patentee expressly defined what he meant by PRT in the '081 patent, which is "a data type that defines a data structure to contain data extracted from XML documents." Dkt. No. 55 at 13-14; Dkt. No. 64 at 16-18.[1]  In fact, the specification includes an express definition of a PRT where it confirms that "[t]he present invention interfaces with the underlying XML documents by copying the XML data components into normalized data objects referred to as PRTs …." '081 patent, 3:66-4:2.  While the Court properly recognized are that PRT are born from "extracted" information, the Court's construction is otherwise too general and not in accord with the specification.  Dkt. No. 77 at 4.  Currently, the Court's construction essentially renders this claim term a nullity because it covers any "unit of information" that is "a subset" of *any* "more general category of information."  If that were true, there would be no need for the patentee to create the term, assign a name to it, and then specifically define its characteristics.  '081 patent, 2:4-7, 3:66-4:2, 4:20-23, 4:35-42.  The patent's requirement that the PRTs are "a data type that defines a data structure" needs to be made clear because the invention *only* pertains to electronic documents, specifically XML documents, and not other forms of documents and records (*e.g.*, paper records), which the Court's construction could cover.  '081 patent, 1:52-58, 3:19-25, 3:66-4:2.  This invention has no purpose outside of electronic XML documents.

Furthermore, the PRTs are not intended to be "arranged for a user" in the sense that the PRTs are not independently seen by the user because it is the dynamic document (DD) that the

---

[1] The patentee also expressly defined what he meant by MRT (see section below on MRT) and DD.

4

user sees and interacts with directly, not the PRTs or the MRTs.  '081 patent, 2:9-11, 3:52-60.  Finally, the invention relates *only* to XML documents and thus the information cannot just be extracted from any "business document" – *e.g.*, a paper file.  '081 patent, 1:52-58, 3:19-25, 3:66-4:2.

In defining PRT consistent with the specification – as the Court must when a term does not have an accepted meaning in the art – the definition of PRT must embrace the fact that a PRT (1) is "a data type that defines a data structure" (*i.e*, electronic records are at issue) and (2) contains electronic data "extracted from XML documents."  '081 patent, 2:4-7, 3:66-4:2, 4:20-23; Dkt. No. 58, Ex. F, Kelly Decl., ¶¶ 13-16.  The specification is clear on these points and a broader more generalized definition is inappropriate.  *Irdeto Access, Inc.*, 383 F.3d at 1300; *Honeywell Intern. Inc.*, 488 F.3d at 991.

For these reasons, and the reasons set forth in IV's prior briefs, the Court's construction of PRT should be revised to read "a data type that defines a data structure to contain data extracted from XML documents."

### C.  "management record type" (MRT)

| IV's Construction | Citi's Construction | Court's Construction |
|---|---|---|
| A data type that defines a *grouping* of primary record types into a hierarchy *and does not include any redundant data* | A data type that defines a user-defined collection of primary record types | Collection of primary record types organized into a hierarchy |

The Court's construction of "management record type" (MRT) should be revised so that the construction further comports with the teachings of the specification.  As the Court's construction recognizes, this term does not have an understood meaning in the art and again, in such situations, the law mandates that the term can only be as broad as the specification dictates.

5

*See, e.g., Irdeto Access, Inc.*, 383 F.3d at 1300; *Honeywell Intern. Inc.*, 488 F.3d at 991.

Though the Court's addition of the phrase "organized into a hierarchy" to the meaning of "management record type" repeats surrounding claim language that already requires "a hierarchy to form a management record type," the law is strict on the point that a novel term be understood to have the meaning dictated by the specification. The construction must stay true to the scope provided by the term by the specification, which confirmed that the phrase "user-defined" in Citi's construction is not supported or mandated by the specification as there are disclosed embodiments with MRTs that are user-defined and others that are not user-defined. Dkt. No. 55 at 15-16; Dkt. No. 64 at 18-19.

To make it clear that, consistent with the specification, the claimed MRTs define a hierarchy but do not include any redundant data, and that the claimed MRTs are not necessarily "user-defined," IV has revised its proposed construction as highlighted in bold above. Specifically, the revised IV construction introduces the concept of the MRTs being a "grouping" and that the MRTs "do not include any redundant data." These characteristics are not only supported by the specification, the patentee expressly defined this requirement of all MRTs. *See* '081 patent, 2:4-9 ("A MRT is a ***grouping*** of PRTs; they contain pointers to individual PRT records and some calculated data."); 3:66-4:2 ("The present invention interfaces with the underlying MXL documents by copying the XML data components into ***normalized data objects referred to as PRTs and organizing PRTs into recognizable business objects referred to as MRTs*** 24."); 4:47-54 ("[U]nlike an XML document, ***a MRT does not have redundant*** data. For example an Open Orders XML document would contain duplicate customer information for every order for the same customer and duplicate product information for every order like for the

6

same product, A MRT does not actually include the customer and product data but has a pointer to the single instance of data for each customer and each product.").

As is to be expected, the specification is consistent that the present invention does not include redundant data within a MRT.  In addition to the express definition given to MRT within the '081 patent, the description of the components of the '081 patent teach how redundancy is avoided within the MRT.  For example, when describing "copying the data in XML documents into the invention's DDs, MRTs, and PRTs," the invention will determine whether the data component is already present, and "[i]f the [primary record instance] already exists …" the invention "updates the [management record pointer family] …." '081 patent, 7:23-27.  The process to ensure that that the MRT does not include redundant data is consistent with the invention's description that new PRTs are not created for a component that "already exists" and that the PRTs are "normalized."  '081 patent, 3:66-4:2, 5:52-53.  The specification as a whole is consistent with the invention's express definition of an MRT as not including any redundant data.

The consistency of the specification regarding the absence of redundancy is a dramatic contrast to the varied disclosure concerning whether the MRT requires it be "user-defined" as Citi tried to graft onto the term, and which the Court implicitly rejected.  In fact, the concepts of MRTs being grouped and not containing redundant data (*i.e.*, that the MRTs point to normalized PRTs that are not repeated) shows that the MRTs need not be user-defined in addition to all the reasons IV provided above.  '081 patent, 2:4-9, 3:66-4:2, 4:47-54, 4:54-57 ("MRTs require less storage space than XML documents and when users change the product information and it is immediately reflected in all MRTs that point to the changed product."); Dkt. No. 55 at 15-16; Dkt. No. 64 at 18-19.  To the extent the Court re-entertains Citi's proposed "user-defined"

limitation, it should be rejected.

For these reasons, and the reasons set forth in IV's prior briefs, the Court's construction of MRT should be revised to read "a data type that defines a grouping of primary record types into a hierarchy and does not include any redundant data."

## II. U.S. PATENT NO. 5,745,574

### A. "[public key] certificate"

| Court's JPMC Construction | Citi's Proposed Construction | Court's New Construction |
|---|---|---|
| A certificate that vouches for the trustworthiness of a public key including by indicating that the public key was issued by the issuer who was supposed to have issued it | Specially constructed data structure which is signed by a certification authority and contains a user's public key, the user's identity, and some additional parameters related to the validity of the certificate | A certificate that vouches for the trustworthiness of a public key. The certificate is a specially constructed data structure which is signed by a certification authority and contains a user's public key, the user's identity, and some additional parameters related to the validity of the certificate |

### B. "certifying and returning the data structure"

| Court's JPMC Construction | Citi's Proposed Construction | Court's New Construction |
|---|---|---|
| Signing the certificate and returning it to the requester | Vouching for the identity of the public key owner by signing the data structure and returning it to the owner/requestor | Vouching for the identity of the public key owner by signing the certificate and returning it to the owner/requestor |

IV believes that the Court's original constructions from the JPMC matter of (1) "public key certification" and (2) "certifying and returning the data structure" were proper for several reasons. First, because the Court construes claims based on the intrinsic evidence, which has not

8

changed, there is no reason for the Court to deviate from its earlier constructions. Second, claim construction should be agnostic to the individual infringement and validity arguments particular to each different matter. But because the Court has two different constructions in two different proceedings, there exists this peculiarity that these claims mean one thing here, but something else in JPMC despite the only differences being extraneous facts, such as the accused products and devices.

Third, the Court's earlier JPMC constructions were clear. Adopting Citi's constructions in whole or in part has only added more verbiage. This is precisely what the Court hoped to avoid: "I want these definitions, to the greatest extent possible, to avoid using terms that in turn need to be defined. There's no reason to define something for informational purposes in a way that creates another ambiguity." March 26, 2015 *Markman* Hearing, at 9:5-9; see *id*, at 3:23 (removing "plurality" from a proposed construction because it was "an excess term that confuses rather than explains").

The Court's original construction for "[public key] certificate" was straightforward. It explained the certificate in the context of the patent. After prompting from Citi, the Court changed it and now the Court's construction includes new terms that open to further definition, such as what is a "specially constructed" data structure as opposed to a "data structure" and what are the "additional parameters related to the validity of the certificate." These additional words will no doubt foster additional sparring between the parties over their meaning.

Second, the Court adopted Citi's proposed construction for "certifying and returning the data structure" that may likely lead to sparring as to what the phrase "vouching for the identity of the public key owner" means or if it adds some limitation to the claim. If the Court did intend the phrase to add some new requirement, then that would improperly importing limitations from

the specification into the claims.  At most, however, it seems this is simply a restating of the purpose of the claim as part of the inherent nature of the invention and is, therefore, unnecessary.

If the Court is inclined to keep Citi's construction, then IV offers the following suggestions to add clarity.  First, IV suggests changing "identity of the public key owner" to "identity of the public key owner **or requestor**."  This mirrors the inclusion of "requestor" at the end of the Court's construction and makes the Court's construction internally consistent.  Second, IV suggests changing the "owner/requestor" at the end of the Court's construction to "owner **or** requestor."  Slashes mean "or" and making this clarification would ensure that Citi did not later argue that the slash in the Court's construction means something else.  By making that explicit, it provides greater clarity and one less potential fight between the parties.  In sum, IV asks that the Court readopt its original construction for "certifying and returning the data structure."  If it does not, then IV suggests this modified construction: "Vouching for the identity of the public key owner **or requestor** by signing the certificate and returning it to the owner **or requestor**."

Dated: June 11, 2015                     DUNNEGAN & SCILEPPI LLC

By */s/  William Dunnegan*
    William Dunnegan (WD9316)
    wd@dunnegan.com
    350 Fifth Avenue
    New York, New York 10118
    (212) 332-8300

               -and-

FEINBERG DAY ALBERTI & THOMPSON LLP

By */s/  Marc Belloli*
    Marc Belloli (Cal Bar No. 244290)
    mbelloli@feinday.com
    Elizabeth Day (Cal Bar No. 177125)
    eday@feinday.com

10

        1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Direct: 650-618-4360
Fax: 650-618-4368
(admitted pro hac vice)

Attorneys for Plaintiffs